# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

GOLDIE D. MEDICK,

                                        Plaintiff,

        v.                                              5:11-CV-851
                                                        (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

HOWARD D. OLINSKY, ESQ., for Plaintiff
ANDREEA L. LECHLEITNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

        Plaintiff "protectively filed"[1] an application for disability insurance benefits and

Supplemental Security Income (SSI) on July 29, 2009, claiming disability beginning

November 1, 2007, resulting from morbid obesity; vertigo; neurologic problems;

diabetes; difficulty sleeping; numbness and pain in both arms and hands; burning and

_____

        [1] When used in conjunction with an "application" for benefits, the term "protective filing"
indicates that a written statement, "such as a letter," has been filed with the Social Security
Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. § 404.630.
There are various requirements for this written statement.  *Id.*  If a proper statement is filed, the Social
Security Administration will use the date of the written statement as the filing date of the application
even if the formal application is not filed until a future date.  Plaintiff's actual application in this case
is dated December 4, 2007. (T. 77-78).

pain in both legs; back pain; and inability to walk without falling down. (Administrative Transcript (T) 17, 67-68, 159-60, 191-94, 196). Plaintiff's applications were denied initially, and plaintiff requested a hearing. (T. 80-81). Plaintiff appeared and testified at a video hearing before an Administrative Law Judge ("ALJ"), Barry Peffley, on December 6, 2010. (T. 17-35). Vocational expert, Alina Kurtanich, also testified at the hearing. (T. 49-50, 52-63). On January 12, 2011, the ALJ denied plaintiff's claims for benefits. (T. 14-26). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on June 2, 2011. (T. 1-5).

## II. __APPLICABLE LAW__

### A. __Disability Standard__

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

2

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

## B.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision.  *Id.  See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.   FACTS

Plaintiff's counsel in this case has reviewed the facts extensively in his brief. (Pl.'s Br. at 2-9).  Defense counsel has incorporated the summary of the case as set forth by plaintiff's counsel, "with the exception of any inferences or conclusions asserted by plaintiff." (Def.'s Br. at 1).  Thus, the court will also adopt the facts as stated by plaintiff's counsel, together with the facts as stated in the ALJ's decision, with any exceptions noted in the following discussion.

## IV.   THE ALJ'S DECISION

After reviewing the evidence, the ALJ found that plaintiff had the following severe impairments that, by definition, "cause more than a minimal effect on the claimant's ability to perform basic work activities": "a torn meniscus of the left knee, bulging disc in the lumbar spine, osteophytes, lumbago, vertigo, migraines, diabetes, obesity and adjustment disorder with a depressed mood." (T. 19).  It is undisputed that none of plaintiff's impairments, singly, or in combination, meet or medically equal a listed impairment under the regulations as found by the ALJ. (T. 19-20).  During the step three analysis, the ALJ extensively discussed plaintiff's adjustment disorder and depressed mood. (T.  20-21).  In making this assessment, the ALJ used the Psychiatric Review Technique ("PRT"). (T. 20-21, 336-39).  After using the PRT form to determine that plaintiff's mental impairments did not meet the severity of any of the listed mental impairments, the ALJ considered the plaintiff's mental residual functional capacity ("RFC), using the Mental RFC form. (T. 21, 24, 340-43).  The ALJ specifically stated that his RFC assessment "reflects the degree of limitation the

undersigned has found in the 'paragraph B' mental function analysis." (T. 21).

The ALJ then found that plaintiff had the RFC to perform sedentary work with additional limitations. *Id.* He found that the plaintiff could frequently push or pull with both her upper extremities; frequently use foot controls with both lower extremities; occasionally climb ramps or stairs, but never ladders, ropes or scaffolds; could only occasionally balance, stoop, kneel, crouch, bend or crawl; could frequently reach with both upper extremities, but could only occasionally reach overhead with both upper extremities; could frequently handle objects with gross manipulation, frequently finger with her left hand, but only occasionally finger with her right hand; and must avoid all concentrated exposure to moving machinery and unprotected heights. (T. 21-22).

With respect to her mental abilities, the ALJ found that plaintiff is limited to work involving simple, routine, and repetitive tasks, in a work environment free of fast paced production requirements and involving only simple work-related decisions, with few, if any workplace changes. (T. 22). The plaintiff would be required to work in a low-stress job, involving only occasional decision making and only occasional changes in the work setting. (T. 22). The ALJ considered plaintiff's "symptoms" and the extent to which they were consistent with the objective medical evidence, together with opinion evidence offered by plaintiff's physicians. *Id.*

The ALJ rejected the opinion of plaintiff's treating physician, Dr. Satterly, who reported that plaintiff was "not capable of any activity," as "inconsistent with his own notes and it is not supported by any medical findings, facts or bases." (T. 24). In

determining that plaintiff could perform the physical requirements of sedentary work, the ALJ relied, in part, upon the opinion of consulting physician Dr. Kalyani Ganesh, who found that plaintiff had no limitation sitting, standing, or using her upper extremities, and had no gross difficulty with balance, but did have a moderate limitation walking and climbing. (T. 24).

The ALJ relied upon Dr. Kristen Barry's consultative psychological evaluation, concluding that plaintiff could understand and follow simple directions, could maintain attention and concentration, but had difficulty handling stressors. Because plaintiff had additional limitation that impeded her ability to perform a full range of sedentary work, the ALJ heard the testimony of a vocational expert ("VE"). (T. 25). In response to the ALJ's hypothetical question, outlining all of plaintiff's limitations, the VE found that plaintiff could perform other work existing in the national economy. (T. 25). Based on this testimony and the medical record, the ALJ found that plaintiff was not disabled from November 1, 2007 until the date of the ALJ's decision on January 12, 2011. (T. 25-26).

## V.   **PLAINTIFF'S CONTENTIONS**

Plaintiff makes the following four claims:

(1)   The ALJ erred in failing to find that plaintiff's "unspecified bilateral neuropathy" was a severe impairment at Step 2. (Pl.'s Br. at 10-12)[2] (Dkt. No. 11).

---

[2] The court will cite to the page numbers that plaintiff's counsel has used at the bottom of the pages of his brief. (Dkt. No. 11). These numbers do not coincide with the numbers assigned to the pages by the court's electronic filing system (CM/ECF), but utilizing counsel's pagination will make it simpler to find the information cited.

(2)    The ALJ's RFC determination is not supported by substantial evidence. (Pl.'s Br. at 12-19).

(3)    The ALJ's credibility finding is not supported by substantial evidence. (Pl.'s Br. at 19-22).

(4)    The VE's testimony was based on an incorrect and incomplete hypothetical question and does not provide substantial evidence to find that plaintiff can perform other work in the national economy. (Pl.'s Br. at 22-24).

Defendant argues that the ALJ's findings are supported by substantial evidence, and that this court should affirm the findings of the Commissioner.  For the following reasons, this court agrees with defendant and will recommend dismissing the complaint.

## VI.   DISCUSSION

### A.    Severe Impairment

#### 1.    Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A  severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1)

8

physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).  It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act."  *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3).  The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken.  *Id.* at 1030.

Often when there are multiple impairments as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step Two may be harmless because the ALJ has continued with sequential analysis and did not deny the claim based on the second step alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL

398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### 2.    Application

In this case, plaintiff claims that the ALJ erred in failing to find that plaintiff's "unspecified" bilateral neuropathy was not a severe impairment. The ALJ found several other of plaintiff's impairments to be severe and continued with the sequential analysis all the way to Step 5, including the consideration of vocational testimony at the hearing. As stated above, the fact that plaintiff has been diagnosed with "unspecified neuropathy" does not establish the severity of the impairment. Plaintiff cites the reports of Dr. Vertino and Dr. Giglio in arguing that "they jointly determined that Plaintiff should be evaluated for polyneuropathy and carpal tunnel syndrome. T. 198, 229, 285." (Pl.'s Br. at 11). However, as defendant points out, on the same page cited by plaintiff's counsel, the report also states that "instead of being very concerned with episodic, mild symptoms that don't seem to be related to neurologic disease, she instead turn her attention to the obvious, significant and chronic problems of obesity and its subsequent health risks." (T. 285).

Dr. Ganesh's September 29, 2009, report supports the ALJ's finding that plaintiff's "unspecified" neuropathy did not create sufficient limitations to be severe

on its own.  In his report, Dr. Ganesh found that plaintiff's deep tendon reflexes were absent bilaterally, she had a "mild motor deficit in her left lower extremity," and decreased pinprick sensation of her upper extremities, and both lower extremities. (T. 323).  However, plaintiff had no limitation in the use of her upper extremities, her motor strength was 5/5 in the upper extremities, 5/5 in her right lower extremity, 4/5 in her left lower extremity, and her grip strength was 5/5 bilaterally. (T. 323, 324).  She had a full range of motion in her forearms and wrists, and her finger dexterity was intact. (*Id.*)  Dr. Ganesh stated that at the time of her examination there was "no gross difficulty noted with balance." (T. 324).

On March 30, 2010, Dr. Jeremy M. Shefner found that neurologically, plaintiff's motor tone was normal, her strength was 5/5 bilaterally, her reflexes were 2 bilaterally, and there was no pronator drift. (T. 416).  Dr. Shefner did find that there was decreased proprioception, vibration and pinprick below the C4-C5 level, but no dysdiadochokinesia.[3]  Plaintiff was not able to close her eyes with her feet together and maintain her balance, but her gait was normal. (T. 416).  Dr. Shefner concluded that plaintiff had some proprioception loss with relatively normal EMG studies, except for "bilateral *mild* carpal tunnel syndrome" and abnormal SSEPs on the lower extremities as well as cervical stenosis seen on MRI. (T. 416) (emphasis added).  The cervical stenosis was in the C4-C5 region without any increased intensity in the

---

[3] Dysdiadochokinesia refers to the inability to perform rapidly alternating movements and is a disturbance of musculoskeletal function. *See* http://medical-dictionary.thefreedictionary.com /dysdiadochokinesia.  Diadochokinesia is defined as the function of arresting one motor impulse and substituting one that is diametrically opposite. DORLANDS MEDICAL DICTIONARY 200 (Shorter Ed.1980).

cervical spinal cord, but with "some displacement of the cord itself and the cecal [sic] sac." (T. 417).

Dr. Shefner noted that plaintiff's "numbness" currently could not be explained as a sensory problem, and it was possible that her diabetes was causing the problem. The doctor also stated that "the patient may have a functional component also associated with bilateral carpal tunnel syndrome . . . ." (T. 417). Dr. Shefner also treated plaintiff's migraine headaches by prescribing medication. (T. 17). To the extent that plaintiff's "unspecified neuropathies" have been discussed, they have been viewed as "mild," such as plaintiff's carpal tunnel syndrome.

In any event, the ALJ found that plaintiff's bulging disc, lumbago, vertigo, and migraines, in addition to other impairments were severe. He cited Dr. Vertino's report finding that all of the plaintiff's neurological complaints "had no focal findings on exam and were unlikely to represent any specific neurologic condition but most likely related to ordinary irritation to the nervous system, her obesity and anxiety." (T. 23) (citing T. 284-85). The ALJ also considered the problems that plaintiff had with her hands, dexterity, and balance in determining that she could do sedentary work. (T. 21-22). The ALJ found that plaintiff could only occasionally finger with her right upper extremity and found that she should avoid all concentrated exposure to "operational control of moving machinery and unprotected heights." (*Id.*) Notwithstanding that the ALJ did not include plaintiff's "unspecified neuropathy"[4] in his list of severe

_____

[4] Additionally, it is unclear what is meant by the term "unspecified neuropathy." In Dr. Vertino's March 2009 report, he stated that plaintiff "could" have early polyneuropathy, but it was "unlikely" given her normal and symmetric reflexes. (T. 284). Dr. Vertino believed that plaintiff's

impairments, the ALJ did consider the limitations imposed by all of plaintiff's impairments, including those that purportedly would be caused by "unspecified neuropathy." Thus, the ALJ's severity determination is supported by substantial evidence, and even if an error existed, it was harmless because the ALJ considered all of plaintiff's limitations in his ultimate decision.

### B.     Residual Functional Capacity/Treating Physician

#### 1.     Legal Standards

##### a.     Residual Functional Capacity

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative

---

neurological symptoms, including her numbness and dropping things, could be caused by a variety of other impairments, including her anxiety, irritation to the carpal tunnel, exacerbated by "weight gain." (T. 285). Dr. Vertino also stated that "[s]he may also have intermittent irritation to cervical roots but without weakness, sensory loss or reflex asymmetry it is very unlikely that there is any significant radiculopathy." (T. 285). As stated above, the doctor believed that her neurologic problems could be substantially related to her obesity. (T. 285). The ALJ found plaintiff's obesity a severe impairment and considered the limitations imposed by it.

discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### b.   Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.*  An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In this case, plaintiff alleges that the ALJ's RFC determination was not supported by substantial evidence because (1) the ALJ did not give enough weight to the treating physician's opinion, while giving too much weight to Dr. Ganesh's opinion; (2) failed to properly apply the Psychiatric Review Technique; and (3) failed to provide function-by-function findings.

14

2.      **Application**

a.      **Treating Physician**

In a form, dated June 1, 2010, plaintiff's treating physician, Dr. Satterly, checked a box stating that plaintiff could do "[n]o activity" in response to a question asking whether plaintiff was "capable of employment at this time." (T. 412).  Dr. Satterly then wrote that plaintiff's "primary diagnosis" was "unspecified bilateral neuropathy." (*Id.*)  Plaintiff argues that the ALJ did not explain why he gave this opinion "little weight" and should have re-contacted Dr. Satterly for clarification if his report was unclear. (Pl.'s Br. at 14).

Contrary to plaintiff's argument, the ALJ's opinion does specify why "little weight" was given to Dr. Satterly's opinion of "total disability." (T. 23-24).  The ALJ states that the form completed by Dr. Satterly is inconsistent with his own notes and not supported by any medical findings.  There are several reports in the record by Dr. Satterly, plaintiff's family physician, dating from June 25, 2008 until June 1, 2010. (T. 364-414).  In June of 2008, Dr. Satterly stated that plaintiff's diagnosis "by the neurologist is 'unspecified bilateral neuropathy.'  I can use this to apply for disability and I think it will be denied but I think that there must be a way to get her the coverage she needs." (T. 365).  He also noted in his report that plaintiff was "caring almost full time for her mother." (*Id.*)

On May 7, 2009, plaintiff saw Dr. Satterly for a follow-up for her diabetes. (T. 374-76).  Dr. Satterly noted that plaintiff had a nerve conduction study, showing carpal tunnel, an MRI showing the hemangioma on her spine, the vertebral spurring,

15

and disc bulging. (T. 374).  However, Dr. Satterly also states that plaintiff had "normal activity and energy level," and that she was a "[h]ealthy appearing individual in no distress." (T. 375).  Dr. Satterly noted that the neurologist told plaintiff to "lose weight" for her carpal tunnel syndrome. (T. 376).  Dr. Satterly states in the report that he explained the rationale for the weight loss prescription and "explained that even the weight gain in pregnancy can result in CTS." (T. 376).

On May 20, 2009, plaintiff saw Dr. Satterly complaining of back, right leg, right arm, and right hip pain due to a fall that she blamed on a dizzy spell. (T. 377).  Dr. Satterly stated that plaintiff's right hand was swollen, but his "objective" examination showed a "[h]ealthy appearing individual in no distress." (T. 377).  He then added that "[s]he does not seem to be in any distress." (*Id.*)  His musculoskeletal examination showed no swelling of the wrist and a "good range of motion, but not without discomfort." (T. 378).  There was some tenderness of the spine, but no point tenderness of the bony spine.  She was "able to move around with no sig[nificant] distress."  Every report authored by Dr. Satterly indicates that plaintiff's appearance is healthy, and she is in no distress. (*See* T. 381, 386, 389, 394, 400, 404, 406, 411).

On June 1, 2010, the same day that Dr. Satterly filled out the form, stating that plaintiff could do "no activity," he also stated that she was healthy-appearing and in no acute distress, although she walked with a limp. (T. 411).  The limp could have been caused because the reason for her visit on June 1, 2010 was that she fell and landed on her left knee.  During that examination, Dr. Satterly stated that it was difficult to assess whether there was swelling in the knee due to the size of her leg, and that here

was no increased warmth of the knee that Dr. Satterly could ascertain. (T. 411). Plaintiff had limited flexion and extension, "with out [sic] pain." (T. 411).

Although there are several times when plaintiff went to Dr. Satterly complaining of falling, his physical examinations never uncovered any acute problems. There is no explanation for Dr. Satterly's statement that plaintiff could do "no" activity, and without such an explanation, the ALJ was correct in stating that Dr. Satterly's other reports were not consistent with this conclusion. In addition, Dr. Ganesh's report indicated that while plaintiff did have moderate limitations in walking and climbing, she would have no limitation sitting, standing, or using her upper extremities. This is supported by the neurologists' opinions, who stated that plaintiff refused to believe that her problems could have been caused or exacerbated by her weight.[5] (T. 285).

Plaintiff's counsel argues that the report of a consultative physician (Dr. Ganesh) cannot provide substantial evidence to defeat the treating physician's opinion. However, Dr. Satterly's opinion that plaintiff could not perform any activity was a box checked on a form, with no medical evidence to support this conclusory statement. (T. 412). In *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), the court held that the "ultimate finding of whether a claimant is disabled and cannot work" is "'reserved to the Commissioner.'" (*See* 20 C.F.R. § 404.1527(e)(1)). When the record contains evidence from other physicians who made findings less "favorable" to the plaintiff, the

---

[5] It is also important to note that Dr. Satterly is plaintiff's general physician, and the neurologists to whom Dr. Satterly referred plaintiff would have a better understanding of whether plaintiff had neuropathy and to what extent this neuropathy would have an affect on plaintiff's physical abilities.

ALJ is entitled to consider these opinions in failing to give the treating physician controlling weight. *Id.*

The regulations state that the ALJ must give adequate reasons that the treating physician is not given controlling weight. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).  In making his decision, the ALJ considered Dr. Satterly's conclusion, but stated that the conclusion was inconsistent with his own notes, inconsistent with Dr. Ganesh's report, and is also inconsistent with the reports of neurologist, Dr. Vertino.  As stated above, Dr. Satterly consistently stated that the plaintiff was in no acute distress, was healthy appearing, and at one point in 2008, was taking care of her mother.

Although plaintiff cites *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) for the proposition that a consulting physician's opinions or report should be given "limited weight," that view is based upon regulations that have since been amended. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993), upholding the new regulations and stating that the new regulations differed from the "treating physician rule" in that they accorded less deference to treating physicians whose opinions are not supported by other evidence; consider the length of the relationship between the physician and the patient to be relevant; and permit the opinions of even nonexamining sources to override treating sources *provided they are supported by evidence in the record.*)  Thus, the report of a consultative physician who does examine the plaintiff may override the treating physician's conclusory allegation that plaintiff can do "no activity" if the consultant's report is supported by medical evidence in the record.

Although Dr. Satterly stated that plaintiff could not do any activity, and stated that he was concerned about plaintiff's frequent falling, he never mentioned that plaintiff would have any trouble sitting for any length of time, the main physical requirement of sedentary work.  Thus, the ALJ was entitled to rely upon Dr. Ganesh's opinion as it was consistent with the other physician's reports, and Dr. Satterly never mentioned that plaintiff would have an inability to sit.  The ALJ considered all plaintiff's other limitations in making his determination that plaintiff could perform a limited range of sedentary work.

Plaintiff's counsel argues that the ALJ should have recontacted Dr. Satterly. However, the regulations and the case law do not require that the treating physician be re-contacted routinely if he or she gives an unclear statement. *See Whipple v. Astrue*, No. 11-1700, 2012 WL 1522005, at *2 (2d Cir. May 2, 2012) (citing *Perex v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); 20 C.F.R. § 404.1512(e)).  The treating physician may be recontacted if his or her information is "inadequate" to determine whether the plaintiff is disabled. *Id.*  In this case, there are many reports from the treating physician, and the ALJ found that Dr. Satterly's reports were inconsistent with his conclusory statement on the disability form.  The ALJ then considered the other physician's reports in making the ultimate determination that plaintiff was not disabled.  Thus, the ALJ did not err in failing to re-contact Dr. Satterly.

### b.    Psychiatric Review Technique

Plaintiff argues that the ALJ failed to "properly" apply the PRT required by the regulations in evaluating mental impairments.  Although plaintiff's counsel articulates

specific facts relating to the plaintiff's limitations, they are the same limitations stated by the ALJ when he evaluated whether plaintiff's mental impairment was of Listing severity and subsequently when he evaluated plaintiff's RFC in conjunction with her mental diagnoses. (T. 19-21).  The ALJ specifically cited the factors contained in the PRT in his evaluation.  The ALJ found that the plaintiff had "no" restriction in her activities of daily living ("ADLs"). (T. 20).  Plaintiff argues that her ADLs are "limited" and then cites to reports discussing her "physical" abilities. (Pl.'s Br. at 17).  The ALJ specifically stated that '[s]he does limited cooking and chores because of her physical not mental impairments. . . . Therefore, the undersigned finds that the claimant has no restrictions in activities of daily living." (T. 20).  Thus, the ALJ's statement about ADLs refers to her mental abilities, not her physical abilities.

The ALJ also found that the plaintiff had "mild" difficulties in social functioning. (T. 21).  Plaintiff makes the same argument in her brief. (T. 17-18).  The ALJ also agreed with Dr. Barry's report stating that plaintiff had "moderate" difficulties in concentration, persistence, and pace. (T. 21).  This is the same argument made by plaintiff in her brief. (Pl.'s Br. at 18).  Plaintiff does not argue that she had any episodes of decompensation.  After determining that plaintiff did not have two "marked limitations" in any of the categories, nor did she have one marked limitation and repeated episodes of decompensation, the ALJ stated that plaintiff's impairment was not of Listing severity. (T. 21-22).  However, the ALJ also stated that he would take plaintiff's mental limitations into consideration in determining her RFC as required by the regulations. (T. 21).  Those limitations were stated in his decision (T.

21-22), and were also discussed with the VE during the hypothetical question which will be discussed below. *See also Whipple v. Astrue*, No. 11-1700, 2012 WL 1522005, at \*2 (holding that the ALJ was correct in considering the four factors in determining that the plaintiff's mental impairment was "severe" and then considering whether, given those limitations, the plaintiff could perform work available in the national economy). Thus, the ALJ properly utilized the PRT in determining both the severity of plaintiff's mental impairment with respect to the Listings and with respect to her general limitations when determining her RFC.

### c.     Function-by-Function Analysis

Finally, plaintiff argues that the ALJ's RFC evaluation was not supported by substantial evidence because he did not give a function-by-function analysis. (Pl.'s Br. at 18-19). The ALJ did, however, give a function-by-function analysis. (T. 21-24). Although in his argument, plaintiff's counsel outlines plaintiff's limitations, he does not state how the ALJ failed to take these limitations into account. Plaintiff states that "Dr. Barry" found that plaintiff had difficulty standing, reaching, bending, and lifting. (Pl.'s Br. at 19) (citing T. 311). However, Dr. Barry was the psychiatric consultant, and the portion of Dr. Barry's report cited by plaintiff's counsel was the plaintiff's statement of her own physical limitations, not Dr. Barry's findings. (T. 311). Dr. Barry's findings were only related to plaintiff's mental impairments and appear on another page of her report. (T. 312).

Plaintiff's counsel then cites Dr. Ganesh's report, stating that plaintiff would have moderate limitations in walking and climbing. (Pl.'s Br. at 19) (citing T. 324).

The ALJ found that plaintiff could perform sedentary work, which involves mostly sitting, so the ALJ was not inconsistent when he credited Dr. Ganesh's report. The ALJ then cites the physical therapist's report, stating that plaintiff had impaired balance and ambulation, difficulty with prolonged standing, and impaired ability to do housework. (Pl.'s Br. at 19) (citing T. 434).

The court would first point out that a physical therapist is not an acceptable medical source under the regulations. *Proper v. Astrue*, No. 6:10-CV-1221, 2012 WL 1085812, at *9 (N.D.N.Y. Feb. 28, 2012) (citations omitted). Although the ALJ may consider a physical therapist's opinion in considering how a plaintiff's impairment affects his or her ability to work,[6] the physical therapist assessment in this case was not inconsistent with an ability to perform sedentary work. The physical therapist did not mention an inability or limitation in plaintiff's ability to sit. The court would also point out that plaintiff was discharged from physical therapy after only a few visits because she failed to keep appointments.[7] (T. 421).

The ALJ properly performed a function-by-function analysis of plaintiff's abilities. Although counsel outlines plaintiff's limitations, his citations are not very different from the ALJ's findings, and it is clear that the ALJ also found that plaintiff was limited in many functions. He took those limitations into account when

---

[6] *Proper v. Astrue*, No. 6:10-CV-1221, 2012 WL 1085812, at *9 n.7 (citing *Chandler v. Callahan*, No. 96–CV–1790, 1998 WL 99384, at *5 (N.D.N.Y. Feb. 23, 1998) (Pooler, J. and DiBianco, M.J.) (citing 20 C.F.R. §§ 404.1513(e)(3), 416.913(e)(3)).

[7] Plaintiff was assessed on October 9, 2009 and was discharged on November 25, 2009. (T. 421).

22

determining that plaintiff could perform sedentary work, and he even considered additional limitations, which resulted in his obtaining the testimony of a VE.  The ALJ's findings are supported by substantial evidence.  In addition to relying upon the reports in the record, the ALJ also considered that plaintiff's assessment of her limitations was only partially credible.

### C.   Credibility

#### 1.   Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting

effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 2.   Application

Plaintiff argues that the ALJ relied upon MRI examinations "in his credibility assessment," but omitted any reference to a December 27, 2005 MRI, showing "diffuse disc bulging from C4 to C7." (Pl.'s Br. at 20).  It is true that the ALJ cited the August 2005 MRI reports, finding that the plaintiff had "mild diffuse posterior bulging of her intervertebral disc in her lower lumbar spine facet joints but no significant central canal stenosis." (T. 22).  The MRI cited by plaintiff's counsel is of plaintiff's cervical spine. (T. 303).  Although plaintiff's counsel states that the December 2005 MRI shows "diffuse disc bulging from C4-C7," the "Impression" portion of the report states "[v]ery mild to mild diffuse disc bulging, C4, C5-6 and C6-7 without spinal cord

compression."[8] (T. 303).  These minimal clinical findings in December of 2005

support the ALJ's determination, and may be why the ALJ did not mention this MRI in

his later analysis.[9]

Although plaintiff argues that the ALJ did not analyze the appropriate factors,

the court finds that the ALJ's analysis is supported by substantial evidence.  Counsel

states that the ALJ "suggested that Plaintiff was not following prescribed treatment"

because she did not seek psychiatric treatment or more 'aggressive' treatment for her

other impairments . . . ." (Pl.'s Br. at 21-22).  Counsel has misread the ALJ's decision.

The ALJ simply stated that plaintiff's condition was not as severe as she stated

because she did not *seek treatment*, not because she did not *follow prescribed*

*treatment*.  In fact, the doctors did not prescribe more aggressive treatment.  In any

event, one of the factors in the credibility analysis is whether plaintiff received "other

treatment to relieve symptoms." 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v).

The ALJ also considered plaintiff's activities, such as caring for her mother in 2008.

(T. 23).

Counsel states that the ALJ did not consider the "narcotic" pain medications

that plaintiff was taking.  The majority of the reports show that plaintiff was taking

Relafen (T. 389, 93, 99, 405, 410, 416) for her pain.  Relafin is an nonsteroidal anti-

---

[8] The court notes that the ALJ did not find that the disc bulging in plaintiff's "cervical spine" was a "severe" impairment, while he did find that the bulging discs in the lumbar spine were severe. (T. 19).

[9] As defendant points out, the ALJ is not required to reconcile every shred of evidence in the record. *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp. 2d 67, 78-79 (N.D.N.Y. 2005) (citations omitted).

inflammatory that is *not* considered a "narcotic drug."

In February of 2009, Dr. Vertino stated that "the patient just takes ibuprofen 600 mg every 8 hours as needed for pain." (T. 283).  In May of 2009, neurologist, Dr. Jubelt prescribed only Ibuprofen as a pain medication.  Occasionally, plaintiff was prescribed Hydrocodone, a narcotic drug.  On May 7, 2009, plaintiff's current medication list did not include either Relafen or Hydrocodone. (T. 374). However, on May 20, 2009, Dr. Satterly prescribed Hydrocodone-acetaminophen after plaintiff stated that she fell and twisted her back. (T. 280, 378).  Dr. Satterly indicated that it was a "new prescription." (T. 378).  In August and September of 2009, Dr. Satterly listed Hydrocodone-acetaminophen as a "current medication," but on November 13, 2009, Hydrocodone-acetaminophen was no longer listed as a "current medication." (T. 389).

From January to June of 2010, Hydrocodone-acetaminophen was not listed on plaintiff's "current medication" list. (T. 399, 403, 405).  On June 1, 2010, Dr. Satterly prescribed Hydrocodone-acetaminophen after plaintiff stated that she fell down the stairs and injured or reinjured her knee. (T. 411).  The doctor stated that "I am giving her a little pain medication to help with comfort especially during sleep." (*Id.*)  Thus, the ALJ did not fail to discuss plaintiff's use of narcotic pain medications because she was not regularly prescribed narcotics for her pain.  As the ALJ correctly pointed out, Dr. Satterly prescribed "a limited amount of pain medication . . . ." (T. 24).

With respect to plaintiff's activities, the court notes that on November 13, 2009, plaintiff went to see Dr. Satterly because she had a rash. (T. 389).  Dr. Satterly stated

that plaintiff carried "a lot of boxes" when she "moved." (T. 389).  Notwithstanding this physical effort, Dr. Satterly stated that plaintiff was "in no distress." (*Id.*)  The ability to carry "boxes" is inconsistent with plaintiff's claim that she is more severely restricted by pain.  Plaintiff argues that the ALJ never mentioned the brace that plaintiff used for her right hand. (Pl.'s Br. at 21).  On August 25, 2009, plaintiff completed a report, stating that she used a brace for her right hand. (T. 213).  On May 7, 2009, Dr. Satterly mentioned plaintiff's carpal tunnel syndrome, but never mentioned that plaintiff needed or wore a brace for her right wrist. (T. 374).  In the same report, Dr. Satterly stated that plaintiff had a "normal activity and energy level." (T. 374).

Thus, the ALJ's assessment of plaintiff's credibility is supported by substantial evidence because he did consider the factors relevant to the credibility determination.

### D.    Vocational Expert/Hypothetical Question

#### 1.    Legal Standards

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566, 416.966.  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilized a VE at the hearing, generally, the VE is questioned using a

hypothetical question that incorporates plaintiff's limitations.  Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F.Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion."  *Dumas*, 712 F.2d at 1554.  *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas*, 712 F.2d at 1553-54).

## 2.   Application

Plaintiff argues that the ALJ disregarded the VE's opinion that "if Plaintiff's disability caused significant anxiety and [she needed] to take breaks approximately every half hour for five to ten minutes there would be no jobs available." (Pl.'s Br. at 22).  While the VE did testify that if plaintiff had those limitations, no jobs would be available, those were limitations included by plaintiff's counsel that were not included by the ALJ in his hypothetical question because those limitations are not supported by the record.  The term "significant anxiety" is never used in the record, and plaintiff is not being treated by any mental health provider for "significant" anxiety.

28

Additionally, there is no evidence, other than plaintiff's allegation that she would have to take breaks every half hour for five to ten minutes.

The ALJ's hypothetical included all of plaintiff's limitations, including those caused by the carpal tunnel syndrome, which would prevent her from frequent fingering with one of her hands.  Plaintiff's counsel argues that the VE's testimony was inconsistent with the Dictionary of Occupational Titles ("DOT") because one of the jobs mentioned by the VE, the telephone information clerk, would require "frequent" fingering, and plaintiff is unable to perform that function even according to the hypothetical question.

As defendant points out, the ALJ found that plaintiff could only "occasionally finger" with her *right* hand, but could "frequently finger" with her *left* hand. (T. 22). The VE could have found that the ability to frequently finger with one hand was sufficient to allow plaintiff to perform the job.  However, even if plaintiff could not perform the job of telephone information clerk, the VE listed two other jobs that plaintiff could perform, including the surveillance system monitor, a job that requires no fingering, or the credit checker, a job that requires only occasional fingering. *See* Dictionary of Occupational Titles, 379.367-010, 1991 WL 673244 (surveillance system monitor); 237.367-014 (credit checker/call-out operator).

Thus, the hypothetical question took all the plaintiff's limitations into consideration, and the VE's testimony is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and

29

the plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have

**FOURTEEN (14) DAYS** within which to file written objections to the foregoing

report.  Any objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: June 21, 2012

Hon. Andrew T. Baxter
U.S.  Magistrate Judge

30